U.S. DISTRICT COURT
DISTRICT OF VERMONT
FILED

2016 JUN -3 AM 11: 42

CLERK

BY_____LAW_____
DEPUTY CLERK

UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF VERMONT

| | |
|---|---|
| UNITED STATES OF AMERICA ) | |
| ) | |
| v. ) | Case No. 2:15-cr-139-2 |
| ) | |
| FELICIA LIVINGSTON ) | |

**OPINION AND ORDER GRANTING DEFENDANT'S MOTION TO SUPPRESS**
(Doc. 30)

This matter came before the court on May 5, 2016 for an evidentiary hearing with regard to Defendant Felicia Livingston's motion to suppress (Doc. 30). At the hearing, Drug Enforcement Agency ("DEA") Agent Adam Chetwynd and DEA Case Agent Timothy Hoffman testified on behalf of the government. Defendant did not testify or call any witnesses.

Defendant argues that the DEA lacked probable cause for her warrantless arrest because the information from a confidential source ("CS1") was both insufficiently reliable and consisted only of a general description that would not cause a person of reasonable prudence to identify her as a suspected drug courier. The government opposes the motion, arguing that CS1 provided reliable information on prior occasions, the DEA corroborated key components of CS1's information on the day in question, and CS1's description of the suspected drug courier was sufficiently particularized to provide probable cause for Defendant's arrest.

Pursuant to a two count Indictment, Defendant is charged with one count of conspiracy to distribute cocaine and heroin, in violation of 21 U.S.C. §§ 841(a)(1), 841(b)(1)(B-C), 846. The government is represented by Assistant United States Attorney Michael P. Drescher and Assistant United States Attorney Kunal Pasricha. Defendant is represented by Richard C. Bothfeld, Esq.

I.      **Findings of Fact.**

In September 2015, an individual known as "Unc" was the target of an ongoing DEA investigation into a drug trafficking organization that Agent Hoffman described as "more sophisticated . . . with larger quantities of heroin being distributed in Vermont from New York." (Tr. 5/5/16 at 42:25-43:2.) The DEA had made multiple seizures in the course of the Unc investigation, including seizures that yielded approximately 200 grams of heroin and 200 grams of cocaine base. The quantities seized appeared to vary based on the dates and times that drug couriers traveled from New York City to Vermont.

On or about September 2, 2015, DEA agents investigated a tip from CS1 that Unc was staying at La Quinta hotel in South Burlington, Vermont, and would soon be traveling to New York City to obtain illegal narcotics. CS1 had provided reliable information on prior occasions,[1] and was communicating with DEA Agent Brandon Hope who acted as CS1's "handler[.]" (Tr. 5/5/16 at 56:25-57:1.)

Thereafter, DEA agents partially corroborated CS1's tip by determining that Unc had registered room 117 at La Quinta in the name of Gilbert Cruz, and that he had traveled to the Bronx where he was staying at a Days Inn hotel. DEA agents observed Unc at the Bronx location, and verified that he had rented a room under another name they knew to be associated with him. CS1 advised that he/she was traveling with Unc back to Vermont. In the early morning hours of September 3, 2015, DEA agents observed Unc returning to La Quinta and entering room 117.

CS1 told Agent Hope that Unc would send a drug courier to Vermont with the narcotics that Unc had purchased. CS1 advised that the courier would arrive on a Greyhound bus in Burlington, Vermont on the morning of September 3, 2015. CS1 described the courier as an African-American woman known as "Snoop," who had "manly features" and who was "larger" or "larger in stature" and would be traveling

---

[1] Information provided by CS1 was included in two search warrant applications that resulted in the seizure of heroin, cocaine base, and related paraphernalia. Based in part on CS1's information, three individuals were subsequently arrested and charged in a criminal complaint for knowingly and willfully conspiring to distribute heroin and cocaine base.

alone[2] and carrying a large load of narcotics. (Tr. 5/5/16 at 11:20-22, 60:12-15.) Agent Chetwynd credibly testified that he did not believe CS1 had personally observed the drug courier.

In anticipation of the drug courier's arrival, DEA agents conducted surveillance at the Greyhound bus station, which was located at the Burlington International Airport. Agent Chetwynd was part of the team conducting surveillance at the bus station, while Agent Hoffman was positioned at La Quinta. Between the hours of 7:00 a.m. and 8:00 a.m., the DEA agents surveilled the arrival of a Greyhound bus from New York City and identified no one matching CS1's description of the drug courier. As a result, the DEA surveillance team left the bus station and returned to La Quinta. CS1 subsequently advised Agent Hope that the drug courier had missed the bus and would arrive on a bus later that same day. Agent Hope relayed this information to the DEA surveillance team.

On September 3, 2015, several Greyhound buses from New York City arrived at the Burlington bus station. According to Agent Chetwynd, someone in the DEA's office checked the bus schedules, but neither he nor Agent Hoffman could recall whether they knew how many buses would arrive that day, or whether the drug courier was expected to be a passenger on the next bus to arrive after the bus she had missed or on a different bus.

Between approximately 1:00 p.m. and 2:00 p.m., DEA agents surveilled the arrival of a Greyhound bus from New York City at the Burlington bus station. Agent Hope radioed that he had spotted a woman matching the drug courier's description disembarking from the bus. He described her as wearing a black jacket and multi-colored (blue and gray) camouflage pants. As he received this dispatch, Agent Chetwynd also saw the woman in question and concluded that she matched CS1's description. He watched as the woman briefly entered the airport terminal for a matter of seconds and then exited from the doors across from the airport's taxi stand. He did not consider her brief entrance into the airport terminal suspicious. Agent Chetwynd exited his vehicle, approached the woman, identified himself as a federal agent, and told her she was under

---

[2] The DEA 6 report summarizing the investigation does not indicate that CS1 advised that the drug courier would be traveling alone.

arrest. The woman was subsequently identified as Defendant. A search incident to her arrest yielded distribution quantities of heroin and cocaine base concealed in Pringles containers located in the bags she was carrying. Defendant was thereafter provided *Miranda* warnings, waived her *Miranda* rights, and made incriminating statements.

At the suppression hearing, Agent Chetwynd could not recall whether there were other African-American females on the same bus as Defendant, or whether all passengers on the bus had disembarked before he and Agent Hope identified Defendant as the drug courier. Agent Chetwynd, however, recalls that he saw no one else matching CS1's description.

Agent Chetwynd identified Defendant in the courtroom. He noted that, with the exception of her clothing and hairstyle, her appearance was unchanged from the time of her arrest. Defendant's height and weight were not provided to the court, nor was there any attempt to describe Defendant for the record. The court advised the parties that it was having difficulty concluding that Defendant matched CS1's description of a woman with "manly features" and "of large stature." (Tr. 5/5/16 at 75:25-76:3.)

## II. Conclusions of Law and Analysis.

### A. Standard of Review.

"An arrest . . . is a serious personal intrusion regardless of whether the person seized is guilty or innocent." *United States v. Watson*, 423 U.S. 411, 428 (1976) (Powell, J., concurring). The Fourth Amendment provides:

> The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

U.S. Const. amend. IV. "Unreasonable searches or seizures conducted without any warrant at all are condemned by the plain language of the first clause of the Amendment." *Payton v. New York*, 445 U.S. 573, 585 (1980).

"The long-prevailing standard of probable cause protects citizens from rash and unreasonable interferences with privacy and from unfounded charges of crime, while

4

giving fair leeway for enforcing the law in the community's protection." *Maryland v. Pringle*, 540 U.S. 366, 370 (2003) (internal quotation marks omitted). Probable cause "exists if a law enforcement official, on the basis of the totality of the circumstances, has sufficient knowledge or reasonably trustworthy information to justify a person of reasonable caution in believing that an offense has been or is being committed by the person to be arrested." *United States v. Steppello*, 664 F.3d 359, 363-64 (2d Cir. 2011) (internal quotation marks omitted).

"To determine whether an officer had probable cause to arrest an individual, [the court] examine[s] the events leading up to the arrest, and then decide[s] whether these historical facts, viewed from the standpoint of an objectively reasonable police officer, amount to probable cause[.]" *Pringle*, 540 U.S. at 371 (internal quotation marks omitted). "[T]he probable-cause standard is a practical, nontechnical conception that deals with the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act. Because the standard is fluid and contextual, a court must examine the totality of the circumstances of a given arrest." *United States v. Delossantos*, 536 F.3d 155, 159 (2d Cir. 2008) (citations and internal quotation marks omitted).

"It is well established that the burden of production and persuasion generally rest upon the movant in a suppression hearing." *United States v. Arboleda*, 633 F.2d 985, 989 (2d Cir. 1980) (internal quotation marks omitted). However, where the defendant challenges a warrantless arrest, "[t]he [g]overnment bears the burden of proof as to establishing probable cause." *Delossantos*, 536 F.3d at 158.

**B.     Whether the DEA had Probable Cause to Arrest Defendant.**

In analyzing whether there was probable cause for Defendant's warrantless arrest, the government must sustain a two-pronged burden. First, the government must establish that CS1 was a reliable source of information regarding the suspected drug courier. Second, the government must establish that CS1's description of the drug courier was sufficiently particularized to provide probable cause for Defendant's arrest.

5

### 1. Whether CS1's Information Regarding the Drug Courier was Reliable.

"The core question in assessing probable cause based upon information supplied by an informant is whether the information is reliable." *United States v. Wagner*, 989 F.2d 69, 72 (2d Cir. 1993). "Often the information needed to supply probable cause is not gathered independently by police officers but instead is provided by professional criminal informants[.]" *United States v. Gagnon*, 373 F.3d 230, 236 (2d Cir. 2004). In evaluating an informant's reliability, a court must consider the totality of the circumstances, including the informant's veracity, reliability, and basis of knowledge, and "whether the information an informant provides is corroborated by independent police investigation[.]" *Id.* (citation omitted); *see also Illinois v. Gates*, 462 U.S. 213, 230 (1983) (holding "an informant's veracity, reliability and basis of knowledge are all highly relevant in determining the value of his report[,] . . . [and] should be understood simply as closely intertwined issues that may usefully illuminate the commonsense, practical question whether there is probable cause") (internal quotation marks omitted).

The government argues that CS1's information regarding the drug courier was reliable because CS1 was known to law enforcement and had demonstrated his/her reliability on previous occasions. In addition, the government points to the accurate information CS1 provided regarding Unc's whereabouts and activities in the hours preceding Defendant's arrest. The court agrees that the government has established that CS1 was generally a reliable and accurate source of information. *See Gagnon*, 373 F.3d at 236 ("[A]n informant who is right about some facts is more likely to be right about others[.]"). However, "[a]n inquiry into the reliability of an informant's information is usually of two general types, not necessarily mutually exclusive: an inquiry into an informant's veracity *and* an inquiry into the quality of his sources of knowledge of the information." *Wagner*, 989 F.2d at 73 (emphasis supplied). "[A]n informant's basis of knowledge . . . remain[s] [an] important factor[] in a 'totality of the circumstances' analysis[.]" *United States v. Canfield*, 212 F.3d 713, 718 (2d Cir. 2000). "By quality of sources [the Second Circuit] mean[s] the degree to which his information is based on

6

reliable means, such as first-hand observations or second-hand information from reliable sources, rather than on unreliable means such as rumor or innuendo." *Wagner*, 989 F.2d at 73.

Although CS1 appeared to have direct and personal knowledge regarding Unc's activities during the relevant time period, his/her basis of knowledge regarding "Snoop" remains unclear. There is no evidence that CS1 personally observed the drug courier or had any prior experience with that person.[3] In such circumstances, CS1's past record of reliability and his/her reliability in terms of Unc's activities are not dispositive. Instead, the focus must be on the reliability of CS1's source of information regarding the drug courier. That source of information was unknown to Agent Chetwynd at the time of Defendant's arrest and remained unknown at the suppression hearing.[4] *See United States v. Gifford*, 727 F.3d 92, 100 (1st Cir. 2013) (finding information insufficiently reliable where "[n]othing in the affidavit indicates the informant's basis of knowledge, for example, on whether the informant just happened to view the grow operation, heard about it as hearsay, or had direct, first-hand knowledge of the grow operation in the [defendant's] home"); *see also United States v. Higgins*, 557 F.3d 381, 390 (6th Cir. 2009) (finding no probable cause for the issuance of a search warrant where, *inter alia*,

---

[3] *Cf. United States v. Wagner*, 989 F.2d 69, 73 (2d Cir. 1993) (noting the strength of the informant's basis of knowledge, as the informant "described numerous occasions on which he personally witnessed, and even participated in, drug distribution-related activities in the [defendant's] home"); *United States v. Brown*, 732 F.3d 569, 574 (6th Cir. 2013) (holding that information was sufficiently reliable where "a confidential informant known to the officer to be reliable *provided first-hand detailed observations* of cocaine—as well as what appeared to be [the defendant] himself selling drugs—at [the defendant's] own house") (emphasis supplied); *United States v. Tiem Trinh*, 665 F.3d 1, 11 (1st Cir. 2011) ("The extent and level of detail as to the [confidential source's] information concerning the house and growing operation reflects knowledge of hidden, illegal activity, . . . [which] weighs in favor of the informant's reliability.").

[4] It would be speculation, albeit not far-fetched, to presume that CS1 obtained the description of the drug courier from Unc. It would require even further speculation, however, to presume that Unc had personally observed the drug courier or had worked with her previously. It is just as likely that Unc obtained the description from his source of supply or from someone else involved in the narcotics transaction. These speculations serve no purpose other than to highlight the lack of evidence regarding CS1's basis of knowledge and the reliability of his/her source of information.

"the affidavit [did not] contain any assertion that the informant had been inside the [suspect's] apartment or that the informant had seen drugs or other evidence in or around [the suspect's] apartment"). The government thus fails to establish that, on the date in question, CS1 was a reliable source of information regarding the drug courier's appearance and the illegal narcotics she would be transporting.

### 2. Whether the Description of the Drug Courier Furnished Probable Cause for Defendant's Arrest.

Pointing to the general reliability of CS1 and CS1's corroborated reliability about Unc in the hours preceding Defendant's arrest, the government nonetheless urges the court to conclude that the seminal case of *Draper v. United States*, 358 U.S. 307 (1959) authorizes Defendant's warrantless arrest. The government argues that in *Draper*, the paid informant's source of information was also unknown, the description of the drug trafficker was similar, and the information possessed regarding the drug trafficker's arrival spanned a two-day period. Defendant counters that CS1's description of the drug courier was less specific than the one at issue in *Draper*, could apply to any number of female passengers disembarking from a bus from New York City, and was too generalized to provide a reasonable basis for Defendant's warrantless arrest.

In *Draper*, the Court considered whether law enforcement had probable cause for a warrantless arrest of a suspected drug trafficker who was expected to arrive on a certain train on either of two days. On September 3, 1956, a paid informant advised a federal narcotics agent that James Draper had recently established a residence at a stated address in Denver and was selling narcotics to addicts in that city. Four days later, on September 7, the informant advised that Draper had gone to Chicago by train on September 6, and would return to Denver by train with three ounces of heroin on either the morning of September 8 or the morning of September 9. The informant described James Draper as "a Negro of light brown complexion, 27 years of age, 5 feet 8 inches tall, weigh[ing] about 160 pounds, and that he was wearing a light colored raincoat, brown slacks and black shoes." *Id.* at 309 n.2. He further advised that Draper would be carrying a tan zipper bag and that he habitually walked very fast. In the previous six months, the

8

informant had been engaged as a "'special employee'" of the Bureau of Narcotics at Denver and had periodically provided information to a federal narcotics agent regarding narcotics violations in exchange for small sums of money. *Id.* at 309. The agent "had always found the information given by [the informant] to be accurate and reliable." *Id.*

As a result of the informant's tip, on September 8, law enforcement surveilled the Denver Union Station and watched all incoming trains from Chicago but did not identify anyone fitting the informant's description of Draper. Law enforcement repeated this surveillance on the morning of September 9 and saw "a person, having the exact physical attributes and wearing the precise clothing described by [the informant], alight from an incoming Chicago train and start walking 'fast' toward the exit. He was carrying a tan zipper bag in his right hand and the left was thrust in his raincoat pocket." *Id.* at 309-10. The federal narcotics agent, accompanied by a police officer, stopped and arrested the individual and found two envelopes of heroin on his person and a syringe in the tan zipper bag. Because the paid informant died four days after the arrest, he was unable to testify at the suppression hearing as to his source of information.

A divided court concluded that law enforcement had probable cause for a warrantless arrest because the informant had "always been found accurate and reliable" and because the defendant was an "exact" and "precise" match in terms of his physical appearance and clothing, the bag that he carried, the speed at which he walked, and his arrival on "one of the very trains [in] the very place stated by [the informant.]" *Id.* at 313. Application of *Draper* to the instant case reveals more distinctions than similarities.

In *Draper*, the facts permit a reasonable inference that the paid informant had personal knowledge of Draper's appearance, clothing, and luggage and thus knew the nature and amount of heroin Draper would be carrying. Among other things, the informant knew Draper's full name, where he lived and approximately how long he had lived there, when and how he traveled to Chicago, and how and approximately when he would return to Denver. Although the government emphasizes the two-day period at issue in *Draper* in contradistinction to the single day at issue here, the two-day period in Draper was actually confined to two mornings. During those two mornings, law

9

enforcement went to the Denver train station and surveilled each train arriving from Chicago to see if anyone matched the informant's description of Draper.

Unlike in *Draper*, the facts in the instant case do not permit a reasonable inference that CS1 had personal knowledge of the drug courier's appearance or knew the type and quantity of drugs she would be carrying.[5] Moreover, although CS1's information was relatively precise when he/she indicated that the drug courier would arrive in Burlington on a Greyhound bus from New York City in the morning hours of September 3, when this did not occur, CS1's information that the drug courier would arrive by bus later that same day was significantly more vague. The DEA agents purportedly checked the bus schedules on the day in question, but the government proffered no evidence as to the number of buses due to arrive in Burlington from New York City that day or why the DEA agents ceased surveillance at the bus terminal in the morning and arrived later that afternoon to surveil the bus on which Defendant was traveling. If there was more precise information regarding the drug courier's travel plans that guided these decisions, it was not provided to the court. *Cf. United States v. Abadia*, 949 F.2d 956, 960 (8th Cir. 1991) (finding probable cause where law enforcement identified the specific plane on which the suspect would arrive, and "by the time [law enforcement] located [the defendant] on the plane, determined that she fit the informant's physical description of . . . the woman who would be smuggling cocaine, and had confirmed her identity, there was probable cause to place her under arrest"). Law enforcement in *Draper* thus had more precise information regarding the time of the anticipated arrival of the suspected drug trafficker and what that person would be carrying. It also had a reasonable basis for concluding that the paid informant's information was based on personal knowledge and an intimate familiarity with Draper's drug trafficking activities. The descriptions at issue in the two cases are even more markedly dissimilar.

---

[5] *See United States v. Gifford*, 727 F.3d 92, 100 (1st Cir. 2013) (noting that "[t]he information [was] not so specific and specialized that it could only be known to a person with inside information").

10

In *Draper*, the informant provided a highly particularized description of Draper's gender, race, age, height, weight, complexion, clothing, footwear, luggage, and gait. After "personally verif[ying] every facet of the information" provided and concluding that the individual alighting from the train and walking fast towards the exit had "the exact physical attributes" of the suspected drug courier and was "wearing the precise clothing and carrying the tan zipper bag[,]" law enforcement lawfully arrested Draper without a warrant. *Draper*, 358 U.S. at 313; *see also United States v. Thompson*, 876 F.2d 1381, 1382 (8th Cir. 1989) (finding probable cause for a warrantless arrest where the defendant matched the suspect's description as "a black male, in his early twenties, about 5'8" tall, with a stocky build and short cropped hair[,]" the detectives had identified the specific plane on which the suspect would arrive, and the detectives observed that, in addition to matching the description, the defendant "was one of only two black male passengers, the other being in his forties").

In contrast, in this case, the drug courier was described only as a large or "larger" African-American woman with "manly features" traveling alone. This type of generalized description, without more, is typically insufficient to give rise to probable cause. *See United States v. Fisher*, 702 F.2d 372, 377, 379 (2d Cir. 1983) (holding that a description of the suspect as a tall, possibly slim, black male did not give rise to probable cause because it was a "most general description" that was "equally applicable to a number of individuals likely to be in the area"); *United States v. Grant*, 682 F.3d 827, 833 (9th Cir. 2012) (holding that "although [the defendant] may have fit the description of the suspect as 'Male, Black, dark complexion, thin build,' that description was much too general by itself to support [probable cause]"); *United States v. Short*, 570 F.2d 1051, 1054 (D.C. Cir. 1978) (holding that although the defendant was found approximately two blocks from the crime scene with the same haircut and similar clothing to the crime suspect, "the description . . . fit[] many young people in that area of Washington[,]" and the officers thus lacked probable cause to arrest the defendant).

There is no evidence that Defendant was the only African-American female exiting the bus, or that it would be unusual for an African-American female to travel

alone to Burlington from New York City. *Cf. Fisher*, 702 F.2d at 376 ("Other factors to be considered in determining whether there is a sufficient basis for arresting a particular individual for a given crime include whether the locale and the time of day increase the likelihood that the individual suspected is the person sought. For example, if the person sought is Black and the neighborhood under surveillance is predominantly Black, the presence of a Black person on the street will have less significance than it would if the neighborhood were predominantly White."). There was also nothing apparently suspicious about Defendant's luggage, the manner in which she left the bus terminal, or the fact that she was proceeding to a taxi stand.

Based upon the totality of the circumstances, the DEA agents may have had a reasonable suspicion that Defendant was engaged in criminal activity. This would have permitted them to briefly detain Defendant, ask for identification, question her about her travel and destination, and inquire as to whether she had any knowledge or information regarding Unc or his alleged drug trafficking activities. *See Terry v. Ohio*, 392 U.S. 1, 22 (1968). Agent Chetwynd also could have attempted to corroborate Defendant's identity by determining whether she responded to the name "Snoop." *See United States v. Morales*, 923 F.2d 621, 625 (8th Cir. 1991) ("When police approached the man and the woman exclaimed 'What is this, Chico?'—thereby confirming the man's nickname—police had independently verified virtually every detail of the tip except whether [the defendant] was carrying cocaine."). As the Supreme Court has observed:

> In *Terry* this Court recognized that "a police officer may in appropriate circumstances and in an appropriate manner approach a person for purposes of investigating possibly criminal behavior even though there is no probable cause to make an arrest." The Fourth Amendment does not require a policeman who lacks the precise level of information necessary for probable cause to arrest to simply shrug his shoulders and allow a crime to occur or a criminal to escape. On the contrary, *Terry* recognizes that it may be the essence of good police work to adopt an intermediate response. A brief stop of a suspicious individual, in order to determine his identity or to maintain the status quo momentarily while obtaining more information, may be most reasonable in light of the facts known to the officer at the time.

*Adams v. Williams*, 407 U.S. 143, 145-46 (1972) (citations omitted); *see also Alabama v. White*, 496 U.S. 325, 330 (1990) ("Reasonable suspicion is a less demanding standard than probable cause not only in the sense that reasonable suspicion can be established with information that is different in quantity or content than that required to establish probable cause, but also in the sense that reasonable suspicion can arise from information that is less reliable than that required to show probable cause."). The court need not decide whether reasonable suspicion existed in this case because, after identifying himself as a federal agent, Agent Chetwynd immediately arrested Defendant.

      For the warrantless arrest of Defendant to be lawful under the Fourth Amendment, the evidence of her criminal wrongdoing must have been sufficient to cause a person of reasonable caution to believe that Defendant was either committing a misdemeanor in Agent Chetwynd's presence (a claim the government does not make), or that there was probable cause to believe Defendant had committed or was committing a felony. *See Watson*, 423 U.S. at 418 ("The cases construing the Fourth Amendment thus reflect the ancient common-law rule that a peace officer was permitted to arrest without a warrant for a misdemeanor or felony committed in his presence as well as for a felony not committed in his presence if there was reasonable ground for making the arrest."); *see also Payton*, 445 U.S. at 591 (recognizing "the well-settled common-law rule that a warrantless arrest in a public place is valid if the arresting officer had probable cause to believe the suspect is a felon"). The government fails to establish that Defendant's warrantless arrest satisfies this standard.

      A reasonably cautious and prudent law enforcement officer could not conclude that Defendant was a felon based solely on the uncorroborated information provided by CS1 derived from an unknown source. Correspondingly, a fair and impartial magistrate judge could not issue an arrest warrant for Defendant merely because she was an African-American female disembarking alone from one of several buses arriving from New York City that day and was alleged to be carrying a large load of narcotics by a confidential source who apparently neither saw her, nor knew her, and whose source of information was not shown to be reliable. *See Pringle*, 540 U.S. at 371 ("The substance of all the

definitions of probable cause is a reasonable ground for belief of guilt, and that the belief of guilt must be particularized with respect to the person to be searched or seized[.]"). This remains true even if the law enforcement officer seeking the arrest warrant attested under oath and in good faith that he or she believed Defendant was "larger" than some unspecified population and that she possessed "manly features." Those additional descriptors are highly subjective and, in any event, were not demonstrated to be accurate when applied to Defendant.

Because Defendant's warrantless arrest violated the Fourth Amendment, the evidence seized incident to her arrest and her incriminating statements must be suppressed. *See Wong Sun v. United States*, 371 U.S. 471, 485-86 (1963).

## CONCLUSION

For the foregoing reasons, the court GRANTS Defendant's motion to suppress (Doc. 30).

SO ORDERED.

Dated at Burlington, in the District of Vermont, this 3rd day of June, 2016.

Christina Reiss, Chief Judge
United States District Court